UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY,
GEICO CASUALTY COMPANY,

                        Plaintiffs,

          -against-

LIANA BINNS, N.P., KYUNGSOOK BU, N.P.,
WELLBEING NP IN FAMILY HEALTH PLLC,
NICOLA BROWN, N.P., MINNIE CHOI, N.P.,
GEORGETTE T. DIXON, N.P., TINEA WHITE,
N.P., LAILA COLLINS, N.P., DIMITRI BAZIN, P.A.,
JEANNIE ANNE PARLAN, N.P., SANDRA
AJIMAVO, N.P., JULIE JACOB, N.P., JONATHAN
BILE, P.A., MIRAN AN, N.P., MICHELLE
YOUNGER, N.P., FALLA POLYCARPE, N.P.,
CHRISTINE SHORTER, N.P., MARIE LOURDES
JEAN-FRANCOIS, N.P., DARLENE SYLVAIN, P.A.,
GAYOUNG KIM, N.P., SEONHEE AN, N.P.,
DORRETT BRYAN, N.P., PRISCILLA ROSE
SANTANA, N.P., BYOUNG IM LEE, N.P., ASHLEY
SIM, P.A., JULIA KAY, N.P., EYRINEY AZER, P.A.,
HYUNG SOOK PAIK, N.P., IDY LIANG, N.P.,
SHERNET BARRETT, N.P., SASHA ARISTIDE,
N.P., MOHAMMADREZA FEIZI LIGHVAN, N.P.,
BARBARA KERR, N.P., PRISCA JOHN-OGAM,
P.A., TATIANA RYBAK, SUSAN TUANO, WILMA
TANGLAO, and JOHN DOE DEFENDANTS 1-10,

                       Defendants.

**MEMORANDUM & ORDER**

**22-CV-1553 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is Plaintiffs' motion to (1) stay all pending collection arbitrations; (2) enjoin Defendants from commencing any additional arbitration or state court collection

proceedings until the resolution of this federal action; and (3) relieve Plaintiffs from their obligation to post security for the injunction. For the reasons stated below, Plaintiffs' motion is GRANTED, as against Defendants Kyungsook Bu, N.P. and Well-being NP in Family Health PLLC.

## I.   BACKGROUND[1]

The Government Employees Insurance Company, together with certain related companies (collectively, "GEICO"), brought this action. GEICO alleges that it has been the target of a no-fault insurance fraud scheme carried out by the thirty-eight individuals and entities named in the Complaint and certain unidentified others. A majority of the named Defendants are healthcare professionals and one professional limited liability company (the "Healthcare Defendants"). (Compl. (Dkt. 1) ¶¶ 11-77.) The remaining Defendants (the "Management Defendants") are not healthcare professionals, but have "secretly and unlawfully owned, controlled, and derived economic benefit from" the services provided by the Healthcare Defendants "in contravention of New York law." (*Id.* ¶¶ 78-81.)[2]

### A.   New York's No-Fault Insurance Scheme

In New York, an insurer is required provide certain no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to the individuals that they insure ("Insureds"). PIP Benefits cover up to $50,000 of necessary healthcare expenses that result from automobile accidents. *See* N.Y. Ins. Law §§ 5101, *et seq.*; N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 11 §§ 65, *et seq.*

---

[1] The following background is taken from the allegations of the Complaint and declarations submitted by GEICO in connection with this motion.

[2] GEICO notes that many of the Management Defendants have previously been involved in litigation with GEICO after allegedly operating similar schemes. (*See* Compl. ¶¶ 102-140.) The Healthcare Defendants operated out of the very same clinics that were used in prior actions. (*Id.* ¶ 166.)

These benefits are provided "to ensure that injured victims . . . have an efficient mechanism to pay for and receive the healthcare services that they need." (Compl. ¶ 87.) Insureds commonly assign their PIP Benefits to healthcare providers in exchange for services, and in those instances, the provider, rather than the Insured, files no-fault claims with the insurance company. *See* NYCRR tit. 11 § 65-3.11(a) (providing that the benefits may be paid only "directly to the applicant" or "upon assignment by the applicant . . . directly to providers of healthcare services").

Providers are prohibited from receiving PIP Benefits if they fail to meet any applicable New York licensing requirement. *Id.* § 65-3.16(a)(12); *see also State Farm Mut. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 321 (2005). This includes, *inter alia*, that unlicensed professionals may not own or control a professional healthcare practice, employ or supervise other healthcare professionals, or derive economic benefit from professional healthcare services. *See* N.Y. Bus. Corp. Law § 1507.

Under the no-fault insurance scheme, insurers must pay PIP Benefits within 30 days of the claimant's provision of proof of the claim. *See* N.Y. Ins. Law § 5106(a); NYCRR tit. 11 § 65-3.8(a), (c). After 30 days, interest begins to accrue at a rate of two percent per month. *See* N.Y. Ins. Law § 5106(a). Claimants may dispute unpaid no-fault claims either in a state civil action or arbitration proceeding. *See* NYCRR tit. 11 § 65-3.9(c)-(d). Insurers are precluded from asserting many defenses to coverage in these proceedings, including most fraud-based defenses. *See Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 10 N.Y.3d 556, 564 (2008). In a civil action to recover no-fault benefits, the Insured merely needs to show that the required statutory billing forms were mailed and received and that the claimed benefits are overdue. *See Viviane Etienne Med. Care, P.C. v. Country-Wide Ins. Co.*, 25 N.Y.3d 498, 506 (2015).

3

In arbitration proceedings to recover no-fault benefits—which insurers must provide for in their contracts, *see* N.Y. Ins. Law § 5106(b); 11 NYCRR § 65-1.1(a), (d)—the process is "an expedited, simplified affair meant to work as quickly and efficiently as possible," and "[d]iscovery is limited or non-existent." *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 99 (2d Cir. 2014) (citing 11 NYCRR § 65-4.5). The Second Circuit has found that "[c]omplex fraud and [racketeering] claims, maturing years after the initial claimants were fully reimbursed, cannot be shoehorned into this system." *Id.* The proceedings "typically are heard and resolved in minutes, with arbitrators conducting one hearing after another, generally in 15-minute intervals," which makes it difficult for an arbitrator to "consider a pattern of fraudulent treatment." (Asmus Decl. (Dkt. 124-3) ¶ 16.) In arbitration proceedings for unpaid no-fault claims, the claimant pays a nominal filing fee, but the defendant insurance company is required to pay a mandatory non-refundable fee of several hundred dollars in each case in which it is named as a respondent. (*Id.* ¶ 14.)

## B.  Operation of the Alleged Scheme

According to GEICO, around June 2019, the Management Defendants recruited the Healthcare Defendants to "serve as the nominal or 'paper' owners of the professional healthcare practices operated in their names" in exchange for compensation. (Compl. ¶¶ 143-44.) The Healthcare Defendants then worked in various clinics (the "Clinics") throughout the New York area. (*Id.* ¶ 164.) The Healthcare Defendants treated patients who were referred to the Clinics by personal injury attorneys or "through a network of individuals . . . who were paid by the Management Defendants for each Insured that they delivered." (*Id.* ¶¶ 157, 162.)[3] Once Insureds arrived at the Clinics, they would be further

---

[3] The personal injury attorneys also benefitted from the referrals since the extensive treatment that would be billed to the insurance company supported higher damages for their clients. (*See id.* ¶ 160.)

referred by receptionists or other non-medical personnel to the Healthcare Defendants for treatment, "regardless of individual symptoms or presentation." (*Id.* ¶¶ 169-70.) In exchange for this further referral, GEICO alleges that the owners of the Clinics were paid "kickbacks," which "were disguised as ostensibly legitimate fees to 'lease' space or personnel from the Clinics." (*Id.* ¶¶ 167-68.)

The Healthcare Defendants treated the Insureds as if they had significant injuries and health problems in order to maximize reimbursements from insurance companies, despite the fact that most were involved in "relatively minor accidents, to the extent that they were involved in any actual accidents at all." (*Id.* ¶ 172.) One of the Healthcare Defendants would conduct an initial examination in which the Insured would be given a diagnosis that would allow for extensive no-fault insurance billing. (*Id.* ¶ 180.) The Healthcare Defendants used a billing code for this initial examination that misrepresented the severity of injuries, the amount of time spent on examinations, the extent of the physical examination and medical decision-making, and the existence of consultation reports. (*See id.* ¶¶ 186-240.) Then, the Insureds would come back for a series of follow-up examinations, during which the Healthcare Defendants would perform medically unnecessary, high-billing value procedures, primarily dry-needling. (*Id.* ¶¶ 241, 243-45, 269, 273.) Dry-needling therapy should typically not be administered until more conservative therapies, such as rest, physical therapy, and massage, have been used, and symptoms have nonetheless persisted for more than three months. (*Id.* ¶¶ 275-76.) These types of injections should not be administered more frequently than every other month. (*Id.* ¶ 278.) However, the Healthcare Defendants regularly submitted reimbursement claims for dry-needling within a month of an automobile accident—frequently within days of the accident—and subjected the Insureds to an extreme amount of dry-needling. (*Id.* ¶¶ 280-81.)

The no-fault claims were submitted through 34 different profes-
sional practices, all of which operated under the professional
licenses belonging to the Healthcare Defendants. (*See* Asmus
Decl. ¶ 6.) The claims were submitted through the 34 different
entities, likely "to reduce the amount of billing submitted
through any single individual or entity or under any single tax
identification number, thereby preventing GEICO from identify-
ing the pattern of fraudulent charges." (Compl. ¶ 293.) GEICO
requested additional verification from Defendants upon develop-
ing suspicion, but the Defendants failed to respond to repeated
requests. (*See id.* ¶ 294.)

In the course of this scheme, Defendants submitted bills seeking
more than $6.4 million in no-fault benefits. (*See* Asmus Decl. ¶
6.) GEICO has already paid the Defendants more than $2.6 mil-
lion in no-fault claims. (*See id.* ¶ 7.) At the time this motion was
filed, Defendants were prosecuting over 950 arbitrations against
GEICO, seeking to collect a total of more than $1.6 million in no-
fault damages, with an average *ad damnum* of under $1,600 per
arbitration proceeding, in addition to 470 civil court suits. (*See
id.* ¶¶ 7-8; Mot. at 10.) There is more than $4.3 million in pending
no-fault insurance claims that have been submitted to GEICO by
Defendants. (Compl. ¶ 3.)

## C.  Evidence of the Alleged Scheme

In support of its fraud claim, GEICO has submitted affidavits from
two of the Healthcare Defendants, Julia Kay and Eyriney Azer,
who have settled with the company, and a chart, totaling over
750 pages, of allegedly fraudulent no-fault claims submitted by
Defendants, which are merely a "representative sample."
(Compl. ¶ 7.) The affidavits tell very similar stories of being hired
by a woman named "Wilma," presumably Wilma Tanglao, one of
the Management Defendants. (*See* Kay Aff. (Dkt. 124-4) ¶¶ 7-8;
Azer Aff. (Dkt. 124-5) ¶ 9.) In their interviews, Wilma informed
Kay and Azer that they would be providing dry-needling to motor

6

vehicle accident patients in several Brooklyn clinics for an hourly wage. (*See* Kay Aff. ¶ 8; Azer Aff. ¶ 9.) To learn dry-needling, they each shadowed a different physician assistant—Kay, a "female physician assistant," and Azer, Dimitri Bazin, one of the Healthcare Defendants. (*See* Kay Aff. ¶ 10; Azer Aff. ¶ 11.) Kay reported that the entire interaction, including the dry-needling and paperwork, took about five minutes per patient, and Azer approximated an average of 10-15 minutes per patient. (*See* Kay Aff. ¶ 10; Azer Aff. ¶ 11.) They were instructed to fill out the dry-needling report in the following manner: indicate that the patient needed an orthopedic consultation, chiropractic, acupuncture, and pain management; check off a predetermined treatment plan of physical therapy 3-5 times per week; check boxes indicating that the patient tolerated the procedure well and that there were no complications; and state that the patient's prognosis was "guarded." (*See* Kay Aff. ¶ 11; Azer Aff. ¶ 12.) Azer was also instructed to indicate the use of at least 10 needles, preferably more, regardless how many needles were actually used. (*See* Azer Aff. ¶ 12.) Azer was even warned that failure to do so would lead to a phone call from an unnamed individual. (*Id.*) Azer was also told by "Wilma" that "we" did not bill to State Farm or GEICO, but received no explanation. (*Id.* ¶ 13.)

When Insureds arrived at the Clinics, the front desk personnel would send them to Kay or Azer's examination room. (*See* Kay Aff. ¶ 13; Azer Aff. ¶ 14.) Kay typically used only one needle, and Azer typically used approximately ten needles, as each was taught. (*See* Kay Aff. ¶ 14; Azer Aff. ¶ 15.) Neither affiant ever performed an examination or consultation of any patient nor filled out any examination reports. (Kay Aff. ¶ 15; Azer Aff. ¶ 16.) At one point, Kay was contacted by an individual who identified himself as Dr. Parisien, who told Kay to indicate on the forms that each patient required sixteen to twenty needles, even though the actual amount was never more than two or three. (*See* Kay Aff. ¶ 16.)

It was only after the fact that both affiants learned that the some-one—presumably Wilma and the other Management Defendants—had been submitting no-fault claims to GEICO and other insurance companies for dry-needling and examinations under their social security numbers, had opened P.O. boxes and bank accounts in their names, and had been receiving checks issued to the affiants from GEICO and other insurance companies. (*See* Kay Aff. ¶ 22; Azer Aff. ¶ 23.) None of this was authorized, and neither affiant had access to the P.O. boxes or bank accounts, nor did they receive any checks. (*See* Kay Aff. ¶¶ 23-24; Azer Aff. ¶¶ 24-25.)

### D.  Procedural History

On March 21, 2022, GEICO initiated this action. (*See* Compl.) In its 139-count Complaint, GEICO alleges violations of the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c); common law fraud; and unjust enrichment. It also seeks a declaration that Defendants have no right to receive payment for any pending bills submitted to GEICO. On July 5, 2022, GEICO filed the instant motion to stay and enjoin. (*See* Mot. (Dkt. 124).) GEICO alleges that between filing the Complaint and the motion to stay and enjoin, Defendants have commenced at least 113 civil court suits and 146 arbitrations. (Asmus Decl. ¶ 9.)

On July 22, 2022, Defendants Kyungsook Bu, N.P. ("Bu") and Wellbeing NP in Family Health PLLC ("Wellbeing NP," and together, the "Bu Defendants"), two of the Healthcare Defendants, filed a motion in opposition, arguing that GEICO's motion should be denied as against them. (*See* Opp. (Dkt. 124-7).) GEICO filed its Reply on July 29, 2022. (*See* Reply (Dkt. 124-8).) At the time that the fully briefed motion was filed, most of the named Defendants had not appeared, so GEICO had started to seek certificates of default. Subsequently, on August 18, 2022, an attorney entered a notice of appearance for all remaining

Defendants other than the Bu Defendants (the "Ryback Defend-
ants"). On August 25, 2022, GEICO and the Ryback Defendants
jointly filed a proposed order stipulating to a stay of all pending
no-fault collection activities and an injunction against future col-
lection activities pending a final resolution of this action. (*See*
Proposed Order (Dkt. 128).) The court so-ordered the proposed
order the next day. (*See* Aug. 26, 2022 Order (Dkt. 130).) Con-
sequently, at this time, the court considers only whether it is
appropriate to also stay and enjoin collection proceedings involv-
ing the Bu Defendants.

### E.   Involvement of the Bu Defendants

Because the court must now consider only whether it should stay
and enjoin collection proceedings involving the Bu Defendants,
the court provides a brief overview of their involvement. Bu is a
licensed nurse practitioner, who "falsely purported to own and
control Bu Medical and Wellbeing NP." (Compl. ¶ 13.) Bu is pur-
portedly the sole member of Wellbeing NP, which "is a New York
professional limited liability company," but GEICO alleges that it
has actually "been owned and controlled by unlicensed non-pro-
fessionals since at least 2021." (*Id.* ¶ 15.) Bu Medical, which has
not been named as a Defendant in this action and has not op-
posed GEICO's motion, "is an unincorporated healthcare practice
that is purportedly owned by Bu, but in actuality has been owned
and controlled by unlicensed non-professionals since at least
2019." (*Id.* ¶ 14.)

GEICO submitted charts with 3,792 entries of allegedly false
claims made by Bu and 3,373 made by Wellbeing NP. (*See* Bu
Chart (Dkt. 1-4); Wellbeing NP Chart (Dkt. 1-5).) And these are
merely "a representative sample of the fraudulent claims that
have been identified to-date." (Compl. ¶ 7.) Two examples drawn
from the charts that are described in the Complaint illustrate the
fraudulent nature of the claims:

On November 3, 2020, an Insured named LF was involved
in an automobile accident. Though LF could not have expe-
rienced persistent pain symptoms or failed conservative
treatments less than a week after the accident, Bu and Bu
Medical—at the direction of the Management Defendants—
purported to administer more than a dozen dry needling in-
jections to LF on November 5, 2020, two days after the
accident.

(Compl. ¶ 282(v).)

On June 19, 2021, an Insured named LB was involved in an
automobile accident. Though LB could not have experienced
persistent pain symptoms or failed conservative treatments
less than a week after the accident, Bu and Wellbeing NP—
at the direction of the Management Defendants—purported
to administer more than a dozen dry needling injections to
LB on June 22, 2021, three days after the accident.

(*Id.* ¶ 282(xi).)

Though GEICO alleges that it has paid $977,000 to Defendants
for fraudulent no-fault claims, only $40,000 is attributable to De-
fendant Bu and $57,000 to Defendant Wellbeing NP, for a total
of $97,000. (*See id.* ¶¶ 1, (F)-(M).) The parties have not apprised
the court of what percentage of the outstanding $4.3 million in
pending no-fault insurance claims involve the Bu Defendants.

## II.   DISCUSSION

In determining whether to enjoin a proceeding or issue a stay,
courts in this Circuit have employed the preliminary injunction
standard. *See Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199,
217 (E.D.N.Y. 2013); *see also Moore v. Consol. Edison Co. of N.Y.*,

409 F.3d 506, 510 (2d Cir. 2005).[4] "[A] movant must demon-
strate (1) irreparable harm absent injunctive relief; and (2) either
a likelihood of success on the merits, or a serious question going
to the merits to make them a fair ground for trial, with a balance
of hardships tipping decidedly in the plaintiff's favor." *Elzanaty*,
929 F. Supp. 2d at 217.[5] Plaintiffs must establish these elements
by a preponderance of the evidence. *See AFA Dispensing Grp. B.V.
v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y.
2010). Courts in this Circuit—including this court—have consist-
ently stayed and enjoined proceedings in the context of similar
no-fault insurance fraud schemes. *See, e.g., Gov't Emps. Ins. Co. v.
Landow*, 21-CV-1440 (NGG) (RER), 2022 WL 939717, at *14
(E.D.N.Y. Mar. 29, 2022); *Gov't Emps. Ins. Co. v. Relief Med., P.C.*,
554 F. Supp. 3d 482, 506 (E.D.N.Y. 2021); *Gov't Emps. Ins. Co.
v. Wallegood, Inc.*, No. 21-CV-1986 (PKC) (RLM) (Dkt. 36), at 21
(E.D.N.Y. July 16, 2021); *Gov't Emps. Ins. Co. v. Beynin*, No. 19-
CV-06118 (DG) (PK), 2021 WL 1146051, at *10 (E.D.N.Y. Mar.
25, 2021); *Gov't Emps. Ins. Co. v. Big Apple Med. Equip., Inc.*, No.
20-CV-5786 (PKC) (JRC) (Dkt. 52), at 22 (E.D.N.Y. Mar. 25,
2021); *Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d
443, 456 (E.D.N.Y. 2020); *State Farm Mut. Auto. Ins. Co. v. Pa-
risien*, 352 F. Supp. 3d 215, 235 (E.D.N.Y. 2018).

## A.   Irreparable Harm

"The showing of irreparable harm is perhaps the single most im-
portant prerequisite for the issuance of a preliminary injunction,
and the moving party must show that injury is likely before the

---

[4] The Bu Defendants dedicate several pages of their opposition to arguing
that the Anti-Injunction Act bars a federal court from staying pending state
litigation in these types of cases. (*See* Opp. at 4-6.) Since GEICO has not
asked this court to stay pending state litigation, the court need not decide
this issue. (*See* Mot. at 1 & n.1.)

[5] When quoting cases, and unless otherwise noted, all citations and quota-
tion marks are omitted, and all alterations are adopted.

other requirements for an injunction will be considered." *Elzanaty*, 929 F. Supp. 2d at 221 (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). A party establishes irreparable harm when "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). The harm "must be shown to be actual and imminent, not remote or speculative." *Id.*

Courts in this district have consistently found irreparable harm where there is concern "with wasting time and resources in an arbitration with awards that might eventually be, at best, inconsistent with this Court's ruling, and at worst, essentially ineffective." *Elzanaty*, 929 F. Supp. 2d at 222. Thus, when "an insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action," courts regularly find irreparable harm. *Parisien*, 352 F. Supp. 3d at 233; *see also Gov't Emps. Ins. Co. v. Tolmasov,* No. 21-CV-7058 (KAM), 2022 WL 1438602, at *5 (E.D.N.Y. May 3, 2022) (finding that allowing the arbitrations and lawsuits to proceed would "nullify [GEICO's] efforts to prove fraud at a systematic level, impair a federal declaratory judgment action over which the Court has taken jurisdiction precisely to eliminate such fragmentation, and deprive [GEICO] of an avenue towards complete relief in any court").

GEICO asserts that there are over 950 pending arbitration proceedings filed by Defendants, in addition to potentially "hundreds more collection arbitrations and civil court collection suits." (Asmus Decl. ¶ 9.) As a result, GEICO faces potentially hundreds of inconsistent awards. However, now that the majority of Defendants have stipulated to a stay of *both* arbitration and state court proceedings as well as an injunction against future

state court and arbitration proceedings, the numbers are presumably substantially lower. Though the court has not been apprised of how many of the pending or potential future proceedings involve the Bu Defendants, irreparable harm does not hinge on the number of inconsistent awards.[6] Rather, it hinges on that fact that GEICO would be subject to "independent and contradictory conclusions" that ultimately may be "rendered ineffective by this Court," pending the disposition of this case. *Gov't Emps. Ins. Co. v. Mayzenberg*, No. 17-CV-2802 (ILG), 2018 WL 6031156, at *5 (E.D.N.Y. Nov. 16, 2018). Since at least some of the pending arbitration proceedings and some of the potential arbitration and state court proceedings involve the Bu Defendants, there is a risk of inconsistent judgments between those other proceedings and this one.

Many courts in this district have also been persuaded by "the risk that money damages would not be available if plaintiff ultimately obtained a declaratory judgment." *Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab.*, No. 20-CV-2391 (KAM), 2020 WL 7042648, at *9 (E.D.N.Y. Dec. 1, 2020); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012) ("The unlikelihood that defendants would, in any event, be able to satisfy a substantial damage award further supports a finding of irreparable harm."). Courts have found that a plaintiff-insurance company would be irreparably harmed where "future monetary compensation would be insufficient," specifically because the defendants "no longer conduct business, and are essentially judgment-

---

[6] This court has not identified any decisions in which courts have held that irreparable injury depends on the number of potentially inconsistent judgments. Though the court has not found any cases involving only a handful of arbitration proceedings, as few as 70 pending arbitration proceedings has been found to constitute irreparable harm. *See Wallegood, Inc.*, No. 21-CV-01986 (PKC) (RLM), at 9-10.

proof." *Tolmasov*, 2022 WL 1438602, at *6. As Judge Matsumoto explained in *Tolmasov*:

> If Defendants are no longer in operation and permitted to prosecute ongoing collection proceedings, GEICO's harm may not be limited to inconsistent judgments or the unnecessary expenditure of time and resources . . . [A]ny dollar awarded to Defendants in a AAA or state court collection proceeding may be permanently unrecoverable, even if GEICO ultimately prevails in this case.

*Id.* at *6. GEICO argues that because all Defendants have closed down medical operations and ceased billing GEICO, GEICO may be unable to recover any monetary award even if it were to prevail in this case. (*See* Asmus Decl. ¶ 9; Mot. at 13 (collecting cases).)[7] Thus, GEICO also faces irreparable harm stemming from the risk that it may be unable to collect monetary damages.

In opposition, the Bu Defendants argue that GEICO's monetary injuries "can be estimated and compensated" and thus there will be no irreparable harm. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). Further, they argue that, under *Allstate Insurance Co. v. Harvey Family Chiropractic*, a factually similar case, "mere injuries . . . in terms of money, time, and energy necessarily expended are not enough" to establish irreparable harm. 677 F. App'x 716, 718 (2d Cir. 2017) (summary order).[8] However, the Bu Defendants' reliance on *Harvey* is misplaced. They are not the first defendants in an alleged no-fault

---

[7] GEICO also argues that the fact that many of the Defendants "are in default[] underscores the risk of irreparable harm." (Mot. at 11.) The Bu Defendants are not in default, so this argument is inapplicable.

[8] The Bu Defendants also argue that they will "on the other hand" suffer severe injury if they can't be paid on these claims that have already been outstanding for a long time. (Opp. at 11.) This line of argument is most appropriate for the balancing of the equities, and the court will take it up at that time. *See infra* discussion at § II.C.

insurance scheme to raise *Harvey*, and courts in this Circuit—including this court—have repeatedly rejected this argument. We have distinguished *Harvey* on the basis that the panel's decision, which the court notes is a non-precedential summary order, focused on "money, time, and energy," whereas we have focused on the irreparable injury of inconsistent judgments and the inability to collect monetary damages. *See, e.g., Landow*, 2022 WL 939717, at *12. *Harvey* does not address the risk of inconsistent outcomes or the risk that money damages might not be available. *See Wellmart*, 435 F. Supp. 3d at 451. The Bu Defendant's reliance on *Universal Acupuncture Pain Services, P.C. v. State Farm Mutual Automobile Insurance Co.* is erroneous for the same reason. *See* 196 F. Supp. 2d 378, 386 (S.D.N.Y. 2002) (finding that an injunction was inappropriate because the plaintiff insurance company "only pled that it will suffer monetary damages," and "[i]t is well-settled that injunctive relief is generally not available in a claim solely for money damages"). Since GEICO has alleged an irreparable injury arising out of inconsistent awards and the possibility of being unable to obtain damages, these cases are distinguishable.

Finally, the Bu Defendants have directed this court to similar cases in which preliminary injunctive relief was denied. (*See* Opp. at 11-12.) These cases are distinguishable. In *Allstate Insurance Company v. Avetisyan*, Judge DeArcy Hall addressed a case "premised upon an alleged pattern comprising discrete claims of fraudulent activity," while the insurer asserted a defense of "medical necessity" in the parallel arbitrations. No. 17-CV-4275 (LDH) (RML), 2018 WL 6344249, at *3-4 (E.D.N.Y. Oct. 30, 2018). In contrast with *Elzanaty*, which Judge DeArcy Hall characterized as involving "proceedings present[ing] actual risks of inconsistent rulings on the same issue," none of the parallel arbitrations in *Avetisyan* would "result in any determination on the issue of fraud . . . [and] there is simply no danger of inconsistent determinations." *Id*. Other courts have similarly found

that *Avetisyan* is distinguishable "because the pending claims at arbitration were different from the claims alleged as fraudulent." *Gov't Emps. Ins. Co. v. Moshe*, No. 20-CV-1098 (FB) (RER), 2020 WL 3503176, at *2 n.3 (E.D.N.Y. June 29, 2020). Here, GEICO contends that the collection proceedings are "aimed at recovering the same No-Fault Benefits that are the subject of GEICO's declaratory judgment claim." (Mot. at 13.) It is clear that if one or more arbitrators, without the context of the greater scheme, found that the Bu Defendants were owed no-fault benefit reimbursements, and GEICO prevailed in this court, there would be numerous inconsistent outcomes.

The other two cases cited by the Bu Defendants were decided orally by Judge Bianco. (*See* Oral Arg. Tr., *Allstate Ins. Co. v. Zelefsky* ("Zelefsky Tr."), No. 13-CV-5830 (JFB) (AKT) (Dkt. 66) (E.D.N.Y. Apr. 2, 2014); Oral Ruling Tr., *Allstate v. E. Island Med. Care* ("Eastern Island Tr."), No. 16-CV-2802 (JFB) (AKT) (Dkt. 106) (E.D.N.Y. June 5, 2017).) *Eastern Island* is distinguishable because the plaintiffs had conceded that if Judge Bianco were to reject their preclusion arguments, there would be no irreparable harm, and Judge Bianco did ultimately reject these arguments. (*See* Eastern Island Tr. at 23:17-18, 24:4-14.) In both *Eastern Island* and *Zelefsky*, Judge Bianco found that monetary damages would be adequate compensation and that potential inconsistencies in judgments did not constitute irreparable harm. (*See id.*; Zelefsky Tr. at 54:6-15.) Because Judge Bianco was ruling from the bench, this court cannot discern the specifics of those cases and is not in a position to analyze the rulings. Other courts in this district have declined to allow *Eastern Island* and *Zelefsky* to "color the[i]r . . . analysis" on this basis. *Wellmart*, 435 F. Supp. 3d at 452 ("The court is unable to discern the specific basis for Judge Bianco's conclusion that Allstate was not at risk of irreparable harm."); *see also Gov't Emps. Ins. Co. v. SMK Pharmacy Corp.*, No. 21-CV-3247 (AMD) (RLM), 2022 WL 541647, at *6

(E.D.N.Y. Feb. 23, 2022) ("[N]either decision explains the basis for finding that there was no irreparable harm.").

Because GEICO has shown the irreparable harm of inconsistent judgments and of being potentially unable to collect damages, GEICO has shown irreparable harm.

## B.   Serious Question Going to the Merits

For a court to issue a preliminary injunction, the moving party must show either a "a likelihood of success on the merits," or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly" in the movant's favor. *Parisien*, 352 F. Supp. 3d at 234 (citing *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). However, a "[l]ikelihood of success is not the focus at the early stages of a case such as this, because any likelihood of success inquiry would be premature." *Elzanaty*, 929 F. Supp. 2d at 217. At this early juncture, this court will instead consider "whether there is a serious question going to the merits to make them a fair ground for trial." *Id.*; *see also Parisien*, 352 F. Supp. 3d at 234. "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (emphasis in original).

GEICO has shown a serious question going to the merits. GEICO is seeking a declaratory judgment that the Defendants have no right to receive payment for any pending bills submitted to GEICO, an estimated $4.3 million in pending no-fault insurance claims. (*See* Compl. ¶¶ 3, 309.) In its 288-page Complaint, GEICO "detail[s] a complicated scheme of alleged fraudulent activity," *Elzanaty*, 929 F. Supp. 2d at 222, intended to exploit New York's

no-fault insurance laws by misrepresenting billing codes, submit-
ting claims for services that were medically unnecessary,
performing services pursuant to an improper kickback scheme,
and violating various New York state licensing laws. (*See gener-
ally* Compl.) The Complaint discusses at least fifty examples of
fraudulent no-fault claims and explains precisely how it is able to
ascertain that each claim is fraudulent. (*See, e.g., id.* ¶¶ 232, 265,
282.) For example, there are numerous examples of excessive
dry-needling injections within days of a car accident, even
though dry-needling should be used only when there are "persis-
tent pain symptoms" or after "conservative treatments" failed.
(*See id.* ¶ 282.) In addition, GEICO submitted over 750 pages of
charts, a mere "representative sample" of thousands of fraudu-
lent claims. (*See id.* ¶ 7.) Finally, the affidavits submitted by Kay
and Azer support GEICO's understanding of the scheme, in par-
ticular, that the Healthcare Defendants were instructed to, and
did in fact, provide excessive and unnecessary treatments.

The Bu Defendants' primary argument in opposition is that they
were not sufficiently involved in the scheme, and many of the
allegations do not signal their involvement. (*See* Opp. at 13-14.)
The court has already discussed the extensive allegations of the
Bu Defendants' conduct, including the detailed examples dis-
cussed in the Complaint and the charts of fraudulent no-fault
claims submitted on their behalf. The court notes that the Bu De-
fendants have not denied submitting these claims nor asserted
that the claims were actually for legitimate services. In the face
of a "representative sample" of 7,165 allegedly fraudulent no-
fault claims, the Bu Defendants do not attempt to argue that
GEICO has somehow misunderstood that these services were
medically necessary. (*See* Bu Chart; Wellbeing NP Chart.) They
do not explain why less than a week after two different accidents,
they injected two different patients with over a dozen dry nee-
dles. (*See* Compl. ¶ 282(v), (xii).)

The Bu Defendants argue that the Kay and Azer affidavits do not name them specifically. However, the affidavits illuminate that certain Healthcare Defendants may have been unwitting participants in this scheme, unaware of the fact that fraudulent claims were being submitted on their behalf. If the Bu Defendants fell into this category, and they too had not filed the no-fault claims and were not receiving reimbursement checks from GEICO, they would have no reason to oppose GEICO's motion for a stay at this time. In fact, they likely would have agreed to stipulate to a stay while this court resolves the allegations of fraud. (*See* Smith Aff. (Dkt. 124-2) ¶ 4.)

Finally, the Bu Defendants focus on the fact that they represent only $97,000 out of the $977,000 that GEICO seeks repayment of, ignoring the fact that this stay will also impact their share of the $4.3 million in pending claims. (*See* Opp. at 2.)[9] However, the fact that the Bu Defendants are responsible for only some portion of the fraud does not mean there is any less of a serious question going to the merits.

Given the extensive evidence of the overall scheme and of the Bu Defendant's involvement, the court finds that there are serious questions going to the merits.

### C. Balance of Hardships

Since the court found that there are "serious questions going to the merits," in lieu of a "likelihood of success on the merits," the court must further determine if the "balance of hardships tip[s] decidedly" in GEICO's favor. *Parisien*, 352 F. Supp. 3d at 234. If

---

[9] The Bu Defendants also disingenuously claim that GEICO has not explained why it cannot face these claims in arbitration or state court. (*See* Opp. at 13.) However, GEICO submitted an affidavit dedicated to explaining precisely why it is difficult to resolve individual no-fault claims and assert fraud defenses in arbitration and state court proceedings. (*See generally* Asmus Decl.)

the court grants GEICO's motion to enjoin the underlying collection proceedings, and GEICO fails to prove its claims, "then, at worst, [the Bu Defendants'] recovery of the no-fault benefits to which they are entitled will be delayed; all [the Bu Defendants] can hope for in pursuing their parallel state lawsuits and arbitrations is to accelerate their receipt of benefits to which they are already entitled." *Id.* at 234-35. In fact, "all parties will benefit from having the issue . . . determined in one action," since the Defendants will be entitled to interest at a rate of two percent per month if this court rules in their favor. *Elzanaty*, 929 F. Supp. 2d at 222. However, if this court does not issue the preliminary injunction, GEICO will suffer irreparable harm due to the inconsistent outcomes between this proceeding and others and the likely inability to recoup its losses in current arbitrations and any future arbitration or state court proceedings.

The Bu Defendants argue that this injunction will inflict a financial toll and create hardship. (Opp. at 3.) Though the court acknowledges that delaying the receipt of funds could cause financial hardship, the Bu Defendants will conserve time and resources by litigating all of the claims in one forum and will be paid interest as a result of the delay. The Bu Defendants seek to have it both ways, on one hand minimizing their financial stake as compared to the other Defendants, but also stressing significant economic harm. The court does not find that a potential delay in receiving reimbursements from GEICO—if it is even appropriate for the Bu Defendants to be receiving these reimbursements at all—tips the balance of hardships in their favor.

Thus, the court finds that the balance of hardships tips decidedly in favor of issuing a preliminary injunction.

### D. Security

GEICO asks the court to waive the security requirement of Federal Rule of Civil Procedure 65(c). This rule provides that "the

court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, courts have crafted an exception for cases that involve the enforcement of "public interests" arising out of "comprehensive federal health and welfare statutes." *Pharm. Soc. of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995). To assess whether a case falls into this category, the court must consider "the nature of the rights being enforced, rather than the nature of the entity enforcing them." *Id.* at 1175. Further, district courts have discretion to dispense with the security requirement "where there has been no proof of likelihood of harm." *Donohue v. Mangano*, 886 F. Supp. 2d 126, 163 (E.D.N.Y. 2012).

While this case was not brought under a federal health and welfare statute, the New York no-fault insurance scheme is "designed to protect accident victims regardless of fault by enabling them to obtain necessary medical attention without concern of the ability to pay." *Mayzenberg*, 2018 WL 6031156, at *10. Consequently, courts in this district have consistently found these types of fraudulent no-fault insurance schemes to implicate the enforcement of "public interests." *See, e.g., Wallegood*, No. 21-CV-01986 (PKC) (RLM), at 19-20; *Landow*, 2022 WL 949717, at *14. The Bu Defendants have not made any arguments in opposition to dispensing with the security requirement. Nor have they sufficiently demonstrated a likelihood of harm as a result of a preliminary injunction because, even if they are rightfully owed these claim reimbursements, the reimbursements will merely be delayed, and they will be paid later with interest. Thus, the court will dispense with the bond requirement since the case implicates the enforcement of public interests, and the Bu Defendants have not established a likelihood of harm.

## III. CONCLUSION

For the reasons stated above, GEICO's motion to (1) stay all pending collection arbitrations; (2) enjoin Defendants from commencing any additional arbitration or state court collection proceeding until the resolution of this federal action; and (3) relieve GEICO from its obligation to post security for the injunction, is GRANTED, as against the Bu Defendants.

SO ORDERED.

Dated:     Brooklyn, New York
           September 28, 2022

                                        s/Nicholas G. Garaufis

                                        NICHOLAS G. GARAUFIS
                                        United States District Judge